Filed 3/4/21  P. v. Bernhard CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074447 |
| v. | (Super.Ct.No. RIF1901056) |
| TIMOTHY ROBERT BERNHARD, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Davis, Judge.
Affirmed.

Robert V. Vallandigham, Jr., under appointment by the Court of Appeal, for
Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney
General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Susan
Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Timothy Robert Bernhard, guilty of robbery. (Pen. Code, § 211.)[1] The trial court granted defendant probation for 36 months with the condition that he serve 365 days in the custody of the Riverside County Sheriff. Defendant contends the trial court erred by denying his two *Marsden*[2] motions. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.     FACTUAL HISTORY

1.     *THE PEOPLE'S CASE*

The victim attends the University of California, Riverside (UCR) and is a member of the Reserve Officer Training Corps (ROTC). The victim is approximately five feet five inches tall and weighs 135 pounds. On March 2, 2019, at approximately 7:00 a.m., the victim was running to an ROTC event on campus. The victim was carrying his ROTC guidon, which is a flag that identifies a platoon. The guidon pole is taller than the victim. As the victim ran past the campus bookstore, he saw defendant standing by the store. Defendant is six feet one inch tall and weighs 185 pounds.

As the victim reached the far end of the bookstore, he stopped to assemble the guidon pole, which was in two pieces. Defendant approached the victim from behind, placed his arm around the victim's neck in a chokehold and choked him. The victim saw that it was defendant by looking at the reflection in the bookstore windows.

---

[1] All subsequent statutory references will be to the Penal Code.

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

2

Defendant said, " 'Give me what you got,' and then took [the victim's] guidon." The victim ran away.

When the victim arrived at the ROTC event, he told his platoon what occurred and called 911. Members of the platoon, including Joseph Barragan, went to the bookstore to retrieve the guidon. Upon arriving at the bookstore, Barragan saw the guidon on a table and defendant walking away. Barragan confronted defendant, who seemed angry. They had a "very heated" exchange of words. A platoon member called the police, and Barragan told the dispatcher defendant's location.

UCR Police Officer Michael Garcia responded. Initially, defendant did not comply with officers' orders and was making incoherent statements. Ultimately, defendant fell down on the ground. Out of an abundance of caution, the police summoned medical assistance for defendant. Paramedics transported defendant to the hospital. Hospital staff determined that defendant was "okay to book." Meanwhile, a police sergeant took photographs of the victim's neck because his neck appeared red.

2. *DEFENDANT'S CASE*

Defendant was the sole witness for the defense. Defendant testified that in early February 2019 he was residing in a sober living home. Defendant relapsed by drinking alcohol and lost his housing. Defendant and his girlfriend began staying in a motel, but a week before March 2, his girlfriend left the motel. Defendant's girlfriend did not answer her telephone. Defendant was anxious. He worried that his girlfriend would be hurt or killed and he felt "like things around [him] were attacking [him]." Defendant

3

spent the week between his girlfriend's disappearance and March 2 wandering around worried about his girlfriend.

On March 2, defendant wandered around the UCR campus. Defendant saw a van drive by slowly, turn around, and leave. Defendant saw the van "[t]he whole night," and the van scared defendant. Defendant "did not want somebody to hurt [him] and kill [him] and torture [him]." Defendant had a bottle of aspirin in his backpack. After seeing the van, at approximately 1:00 a.m., defendant consumed the entire bottle of aspirin. Defendant decided that he would rather kill himself than be tortured and killed by another person. Defendant vomited.

At 7:00 a.m., defendant saw the victim. Defendant put his arm around the victim's shoulder. Defendant wanted the victim to help him because defendant was anxious and vomiting. Defendant was unable to say he needed help because he was having difficulty speaking. Defendant was not trying to scare the victim or take his guidon. The victim dropped the guidon and ran away. Defendant put the guidon on a table and cried. When the police arrived, an officer ran "up with a taser," and defendant fell to the ground. Defendant was unable to tell the police that he needed help. At the hospital, a person drew defendant's blood, and defendant passed out.

Defendant denied that he said to the victim, " 'Give me what you got.' " Defendant explained that he would have been unable to make that statement because he "couldn't even speak." Defendant denied arguing with Barragan. Defendant said one thing to Barragan, which Barragan was unable to understand.

4

### 3. *PROCEDURAL HISTORY*

The People filed a felony complaint against defendant on March 6, 2019. Mohammad Qazi of the Riverside County Public Defender's Office represented defendant at the preliminary hearing. Defendant was held to answer, and the People filed an information against defendant on May 7. When defendant was arraigned on the information, he was represented by Jessica Brownsell. The record does not reflect that Brownsell is with the Public Defender's Office, but we presume that she is.

On June 6, a trial readiness conference was held. Defendant was represented by Amanda Vanaman, a deputy public defender, who subsequently represented defendant at trial. At the trial readiness conference, the trial court granted Vanaman's motion for a continuance of the trial and ordered "Mental Health . . . to turn over psychological records relating to the defendant and provide them to PD by 06/26/2019." On June 8, a clinical therapist conducted an initial mental health assessment of defendant. The therapist diagnosed defendant with major depressive disorder and generalized anxiety disorder. The therapist concluded that it still needed to be determined if defendant suffered from psychosis. The therapist recommended defendant be referred to a psychiatrist.

On July 10, another trial readiness conference was held. Vanaman filed the report from the June 8 assessment as prima facie evidence that defendant qualified for pretrial diversion due to a mental health disorder. (§ 1001.36) Vanaman asserted, "Defendant's mental disorder played a significant role, in whole or in part, motivating Defendant's alleged criminal acts. This is evidenced by the fact that he took an

impulsive action while experiencing excessive worry, which made him edgy and irritable." The trial court granted Vanaman's motion for a continuance of the trial and set a hearing regarding pretrial diversion due to a mental health disorder. (§ 1001.36.)

On August 14, the trial court found there was prima facie evidence that defendant met the criteria for pretrial diversion and set a hearing for August 20 regarding pretrial mental health diversion. At the August 20 hearing, Vanaman announced that defendant declined to participate in the pretrial mental health diversion program. On August 28, the parties announced they were ready for trial. The trial trailed to September 16.

4.     *FIRST MARSDEN MOTION*

On September 16, defendant made his first *Marsden* motion. Defendant said he had not spoken to Vanaman about her plan for his defense. Defendant said Vanaman failed to obtain his hospital records, photographs of the crime scene, and videos from police body cameras. Defendant said Vanaman is "a very intelligent person" and that he was "not mad or upset" at her, but that he felt he was not "getting the defense and the help that [he is] entitled to."

Vanaman said she met with defendant in jail when she was assigned to his case and "got his whole statement of what happened." Vanaman obtained defendant's mental health records from the jail for the diversion program. Vanaman spoke to defendant "several times . . . over the last week" when defendant was in court. In regard to the defense defendant wanted to present, Vanaman said she told defendant that it "can only come from him . . . that it wouldn't be included in medical records." In regard to videos from police body cameras, Vanaman said she requested the videos

6

from the prosecutor, but no such videos were booked into evidence. The defense investigator requested video from the bookstore's surveillance cameras, but it was determined that there were no cameras pointed at the area where the incident occurred.

Defendant said that, in an e-mail from the bookstore manager to defendant's "other lawyer" (presumably Mr. Qazi who had represented defendant at his preliminary hearing), the manager said there are cameras at the store's entrance, but Vanaman told defendant that the entrance camera was focused on the area inside the store—not outside the store. Defendant explained the front of the store is entirely glass, so if a camera were pointed at the entrance, it would presumably capture the exterior of the store as well. The trial court asked if the defense investigator watched the bookstore's video from the day of the incident or if he was only told about the video. Vanaman said she did not know the answer to that question. The trial court told Vanaman to review the video or have her investigator do it. The trial court denied defendant's *Marsden* motion. The trial court continued the start of trial.

5.    *PRETRIAL DIVERSION*

On September 24, the issue of mental health pretrial diversion was again raised. Vanaman argued that defendant had been diagnosed with generalized anxiety disorder and major depressive order; she set forth a list of his symptoms; she explained that his mental health issues could have caused the crime in this case; and she asserted that defendant would not pose an unreasonable risk of danger to public safety if treated by a professional.

7

The prosecutor argued that defendant approached the victim from behind, which meant defendant was attacking—not reacting to any stimuli caused by the victim. Further, the prosecutor asserted that defendant was not suitable for diversion because "[h]e's on probation and can't comply with the probation that he's on." Vanaman argued that defendant was on summary probation, which lacked any services or support. Vanaman said defendant was "very interested in treatment."

The trial court found defendant was not a suitable candidate for diversion due to defendant being on probation at the time of the instant offense as well as defendant's "lengthy criminal history."

### 6.    *SECOND MARSDEN MOTION*

On September 25, defendant made his second *Marsden* motion. Defendant said he repeatedly asked Vanaman about the video cameras at the entrance to the bookstore, and she kept telling him there was no footage of the exterior of the store. Defendant also complained that the photographs of the victim's neck that he received were black and white, so they did not show the redness on the victim's neck. Defendant said he had not spoken to Vanaman about her defense strategy, and that Vanaman did not want to communicate with him. However, defendant then said Vanaman came to the jail on September 17, which "was a little better. And she tells me that she wants to say that I got on a bender. And I did what I did. So she wants to admit guilt. That is crazy to me."

8

Vanaman said that, after the first *Marsden* hearing, an investigator contacted the UCR police to examine the video from the entrance of the bookstore. The investigator learned that "the only videos that cover that area are well back in the store and do not show what we need it to show." The investigator asked about cameras on the exterior of the building and was informed that they are "dummy cameras. They are not active surveillance video cameras."

In regard to the black and white photographs, Vanaman explained that she was given black and white copies of the prosecution's photographs, and she would provide defendant with color copies as soon as she had them.

Vanaman represented that she had visited defendant on September 17, and they "discussed his trial from beginning to end." During that meeting, defendant asked Vanaman to get records from the ambulance company that took him to the hospital. The next day, the defense investigator served a subpoena on the ambulance company, and on September 25, the ambulance company responded and said it would send the records. Additionally, Vanaman said she had been an attorney for nearly four years, all those years had been in criminal defense. Her experience included approximately 150 preliminary hearings and 10 trials.

The trial court asked if defendant had anything else to argue. Defendant asserted that Vanaman should have obtained his hospital records to confirm that he had swallowed a bottle of aspirin, which would help to show that he approached the victim because he needed help. The trial court explained that voluntary intoxication generally

is not a defense and that such evidence "would involve an expert. And I don't know what the expert would say."

The trial court found that Vanaman was capable of representing defendant and that "[defendant] seems very capable of communicating to his attorney the things that he thinks are important in the case. And then so there's no reason in [the court's] mind to grant a Marsden [motion]." The trial court denied defendant's second *Marsden* motion.

### 7.     *CLOSING ARGUMENT*

During closing argument to the jury, Vanaman argued that defendant's actions were misunderstood. Vanaman asserted defendant had attempted suicide and was seeking assistance when he touched the victim. Vanaman noted that defendant did not run or hide after the victim left, and he did not try to stop Barragan from taking the guidon. Vanaman contended the evidence left a reasonable doubt as to whether defendant had the intent to permanently deprive.

### DISCUSSION

A *Marsden* motion should be granted " ' "if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.] 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." '

10

[Citation.] [¶] 'We review the denial of a *Marsden* motion for abuse of discretion.' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

Defendant contends the trial court erred by denying his *Marsden* motions. Defendant asserts Vanaman was unable to provide adequate representation because (1) she failed to present expert testimony to establish that defendant's mental state prevented him from forming the intent to permanently deprive; (2) she did not realize that the ambulance company had records for defendant until days before trial began; (3) she failed to adequately explain defendant's defense theory to the trial court; and (4) she failed to meet with defendant until just prior to trial. Further, defendant asserts the lack of adequate representation caused an irreconcilable conflict in the attorney-client relationship.

As to the first issue raised by defendant—the lack of expert testimony—we must limit our review to the information available to the trial court at the time of the rulings on the *Marsden* motions. (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425.) That means Vanaman's decision at trial to not present the testimony of a mental health expert cannot be considered when reviewing the reasonableness of the rulings on the pretrial *Marsden* motions.

Nevertheless, for the sake of addressing defendant's contention, we will discuss the lack of expert testimony at trial. In closing argument, Vanaman asserted that defendant's actions were misunderstood by the victim. In defendant's version of the events, he put his arm around the victim's shoulder, defendant tried to ask for help but had trouble speaking, and the victim ran away leaving the guidon behind. The

11

testimony of a mental health expert would have had little value in the misunderstanding defense argued by Vanaman.

Further, because Vanaman did not present expert testimony that defendant's mental health crisis caused him to be unable to form the specific intent to deprive, we have no basis by which to conclude such evidence might exist. The mental health evaluation from the jail, used for the pretrial diversion argument, reflected a diagnosis of depression and anxiety. The report also indicated that psychosis needed to be ruled out. However, defendant did not testify that he touched the victim because of a psychotic reason; defendant said he touched the victim because defendant needed help. Defendant fails to indicate that an expert would have testified that a person who was sufficiently mentally well to seek help would have been insufficiently well to form the intent to permanently deprive. In sum, it is unclear from this record whether Vanaman could have found an expert to testify that defendant's mental health crisis caused him to be unable to form the intent to permanently deprive.

The next issue raised by defendant is that Vanaman was unaware, until days prior to trial, that the ambulance company had records pertaining to defendant. Although occurring shortly before trial, Vanaman did speak with defendant and learned of the ambulance transport prior to trial, and she issued a subpoena for the ambulance company's records prior to trial. The trial court could reasonably view Vanaman's actions as (1) sufficiently communicating with defendant because she learned the information from defendant, and (2) adequately representing defendant because she

immediately issued a subpoena for the records. Therefore, the trial court did not abuse its discretion as to this issue.

Next, defendant contends Vanaman failed to adequately explain defendant's theory of the case to the trial court during the second *Marsden* motion. The following are the relevant portions of the transcript:

"[Defendant][3]: Okay. Your Honor, if what was going on with me—and I took a whole bottle of Aspirin because what was going on with me that—I just wanted to kill myself before I got killed. Okay? [¶] . . . So this is going to show that later that I needed help. And that's why I put my arm on this victim for help, not to rob him." The trial court responded, in part: "Generally, voluntary intoxication isn't a defense, but I would leave it up to the attorneys to determine."

On appeal, defendant asserts Vanaman failed to adequately explain to the trial court that defendant did not want a voluntary intoxication defense. Given that it was a *Marsden* motion, and defendant's point was that Vanaman was not doing what defendant wanted in the case, it would have been rather presumptuous for Vanaman to explain defendant's theory to the trial court for him. We do not fault Vanaman for allowing defendant to explain his *Marsden* argument in his own words. (See *People v. Hart* (1999) 20 Cal.4th 546, 603 [" 'the trial court must permit the defendant to explain the basis of his contention' "].) We conclude the trial court did not err as to this issue.

---

[3] The reporter's transcript reflects the speaker is Vanaman. From context, we conclude that is an error and the speaker is defendant.

Next, defendant complains that Vanaman "failed to meet with him to discuss the case for four months while he sat in jail." In April, at the preliminary hearing, defendant was represented by Mohammad Qazi. Vanaman was assigned to defendant's case in May, and she met with defendant in the jail in June or July. During that meeting, Vanaman "got [defendant's] whole statement of what happened." Vanaman did not ignore defendant for four months because she was not assigned to defendant's case until May. Accordingly, the trial court did not err as to this issue.

In regard to an alleged irreconcilable conflict in the attorney-client relationship, the trial court could reasonably conclude that the relationship was satisfactory. At the first *Marsden* hearing, defendant said Vanaman is "a very intelligent person" and that he was "not mad or upset" at her. At the second *Marsden* hearing, defendant said he and Vanaman spoke at the jail on Tuesday "[a]nd that was a little better" but he disagreed with her defense strategy of asserting defendant was intoxicated at the time of the offense. At both *Marsden* hearings, defendant failed to describe a breakdown of the attorney-client relationship, rather he described some disagreements with Vanaman's strategy. One could reasonably conclude that the disagreements did not impair the relationship because the two were still communicating in a productive manner, e.g., defendant told Vanaman about the ambulance and she immediately subpoenaed the records.

In summary, we conclude that the trial court did not abuse its discretion by denying defendant's *Marsden* motions.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                    J.

We concur:

McKINSTER _____
                Acting P. J.

FIELDS _____
                        J.

15